757 A.2d 152

**James E. RUTH, III.**

v.

**STATE of Maryland.**

**No. 259, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

June 1, 2000.

Reconsideration Denied Aug. 31, 2000.

Michael R. Malloy, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for Appellant.

Steven L. Holcomb, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore and M. Kenneth Long, Jr., State's Atty. for Washington County, Hagerstown, on the brief), for Appellee.

Argued before MURPHY, C.J., and KENNEY and PAUL E. ALPERT (Ret'd, specially assigned), JJ.

KENNEY, Judge.

Appellant, James E. Ruth, III, and co-defendant Christopher L. Brown were tried by a jury in the Circuit Court for Washington County for crimes relating to the theft of a vehicle. Both appellant and Mr. Brown were represented by the same attorney at trial. Appellant was convicted of con-

spiracy to commit theft of property valued at more than $300 and subsequently sentenced to fifteen years of imprisonment.[1] Mr. Brown was convicted of conspiracy to commit theft of property valued at more than $300, four counts of theft of property valued at less than $300, and malicious destruction of property.[2]

Appellant asks two questions on appeal:

I. Was the evidence sufficient to sustain his conviction for conspiracy to commit theft of property valued at more than $300?

II. Did the trial court err in denying his motion for a new trial claiming 1) ineffective assistance of counsel, and 2) juror misconduct?

Finding no error, we shall affirm the judgments of the trial court.

## FACTS

Sometime during the late evening of September 15, 1997, and the early morning of September 16, 1997, Julie and Tom Easterday's 1996 red Jeep Cherokee was stolen from their home in Hagerstown, Maryland. The couple bought the Jeep new in 1996 and paid approximately $22,000 for it. The Jeep was found the next day on cement blocks in a corn field near Hagerstown, stripped of its rims, tires, and radio. Missing from inside the Jeep were, among other things, two baby strollers and a crib.

Jeannie Stangle, who was eighteen years old at the time of trial, was the State's principal witness. She testified that on the night of September 15 and the early morning hours of September 16, she was "hanging out" with appellant, who was her friend. At some point, they drove to Christopher Brown's home and picked up Mr. Brown and Eric Seal. The four

---

1. The jury acquitted appellant of four counts of theft of property valued at $300 or less, and malicious destruction of property.

2. Mr. Brown is not a party in this appeal.

decided to drive around in appellant's Chevy Blazer. Because appellant was drunk, he asked Ms. Stangle to drive.

Ms. Stangle testified that, as she drove, the three men started talking about stealing a Jeep Cherokee. Appellant asked her to drive down a side street where they spotted a red Jeep Cherokee parked in the driveway of a house. She stopped the car and Mr. Brown and Mr. Seal exited the car with socks on their hands. About ten minutes later, Mr. Brown and Mr. Seal "[c]ame screaming around the corner with the Cherokee." Appellant directed her to drive behind the Jeep.

Ms. Stangle testified that over the next several hours she followed the Jeep to various locations. At one point, the Jeep stopped in a field. Appellant exited his car and walked over to the Jeep. Appellant took a stroller from the Jeep and threw it in a creek. While appellant took another stroller and portable crib from the Jeep and put it in the trunk of his car, Mr. Brown and Mr. Seal attempted to remove the stereo from the Jeep. Appellant then returned to his Blazer and Mr. Brown and Mr. Seal to the Jeep. They then drove to a tree nursery, retrieved some cement blocks, and put the Jeep on the blocks in a field. When the Jeep was up on the blocks, appellant and Mr. Brown removed the rims and tires from the Jeep. The three men then piled into the Blazer and left the area.

Five weeks after the theft of the Jeep, Ms. Stangle telephoned the Washington County Sheriff's Department and told the police about the theft. On December 9, a police investigator went to Mr. Seal's house and removed a stereo from his stepmother's car. Although the stereo's serial number and manufacturer number had been destroyed, the stereo was the same model as that taken from the Easterday's Jeep. Mr. Seal's stepmother testified that Chris Brown installed the stereo and had told her that he had bought the stereo at a flea market.

The essence of the defense was that Ms. Stangle was not a credible witness. Joseph Feizer, a friend of appellant's, testi-

fied that, about eight months after the Jeep was stolen, Ms. Stangle told him that she was trying to get both appellant and Mr. Brown in trouble. She explained to Mr. Feizer that she was mad at appellant and Mr. Brown because appellant told Mr. Brown that she had a venereal disease and Mr. Brown "wouldn't talk to her after that." Mr. Feizer testified that, in his opinion, Ms. Stangle was not a truthful person. Felicia Ann Sheridan testified that she and Ms. Stangle were friends. Ms. Sheridan testified that, about seven months after the Jeep was stolen, Ms. Stangle told her that she was mad at appellant for telling Mr. Brown that she had a venereal disease. Ms. Sheridan testified that Ms. Stangle told her that she was "going to set [appellant] and his two other friends up."

## DISCUSSION

### I.

Appellant argues that there was insufficient evidence to sustain his conviction for conspiracy to commit theft of property valued at $300 or more because Ms. Stangle's testimony was not credible. Appellant has failed to preserve this argument for our review.

Maryland Rule 4–324(a) provides, "A defendant may move for judgment of acquittal ... at the close of the evidence offered by the State and in a jury trial, at the close of all the evidence." A failure to move for judgment of acquittal at both the end of the State's case and, after presenting evidence, the end of the defense's case, results in a failure to preserve the issue for appellate review. *Ennis v. State*, 306 Md. 579, 583–87, 510 A.2d 573 (1986) (holding that although defendant moved for judgment of acquittal at the end of the State's case, he failed to move for judgment of acquittal after presenting his defense; thus, he failed to preserve his argument for appellate review); *Dumornay v. State*, 106 Md.App. 361, 375, 664 A.2d 469 (1995) (defendant failed to move for judgment of acquittal at close of all the evidence; therefore, the issue of sufficiency of the evidence was not properly before the appellate court); *Briggs v. State*, 90 Md.App. 60, 66, 599 A.2d 1221

(1992) (failure to renew motion for judgment of acquittal at the close of the defendant's case waives claim of legal insufficiency).

Here, appellant moved for judgment of acquittal at the close of the State's case, but appellant did not renew his motion after he presented his defense. Accordingly, by failing to move for judgment of acquittal after presenting his defense, appellant has failed to preserve his sufficiency argument for our review.

 Even if he had preserved his argument for our review, we would find it without merit. Appellant's argument that Ms. Stangle was not a credible witness goes to the weight of the evidence, rather than its sufficiency. *See Binnie v. State*, 321 Md. 572, 580, 583 A.2d 1037 (1991). The jury was free to believe her testimony, believe only parts of her testimony, or disbelieve all of her testimony. *See Muir v. State*, 64 Md.App. 648, 654, 498 A.2d 666 (1985), *aff'd*, 308 Md. 208, 517 A.2d 1105 (1986).

## II.

Appellant also argues that the lower court erred in denying his motion for a new trial. The basis of appellant's motion was twofold: 1) that his attorney was inadequate because his attorney represented both appellant and his co-defendant, Mr. Brown, and 2) juror misconduct. Neither claim has merit.

 Within ten days of a verdict, a defendant may file a motion for a new trial and "the court, in the interest of justice, may order a new trial." Maryland Rule 4-331(a). A trial court has wide latitude in considering a motion for a new trial and may consider many factors, including the weighing of evidence and the credibility of the witnesses. *Argyrou v. State*, 349 Md. 587, 599–600, 709 A.2d 1194 (1998). As the Court of Appeals stated:

[T]he breadth of the trial court's discretion to grant or deny a new trial is not fixed or immutable; it will expand and contract depending upon the nature of the factors being

considered, and the extent to which its exercise depends upon the opportunity the trial judge had to feel the pulse of the trial, and to rely on his or her own impression in determining the questions of fairness and justice.

*Argyrou,* 349 Md. at 600, 709 A.2d 1194. *See Wiggins v. State,* 324 Md. 551, 570, 597 A.2d 1359 (1991), *cert. denied,* 503 U.S. 1007, 112 S.Ct. 1765, 118 L.Ed.2d 427 (1992).

■ Ordinarily, a trial judge's granting or refusing to grant a new trial is not reviewable by this Court except under the most extraordinary or compelling of circumstances. *Marks v. State,* 84 Md.App. 269, 290, 578 A.2d 828 (1990), *cert. denied,* 321 Md. 502, 583 A.2d 275 (1991).

This is true even though the trial judge's decision is based on mistake or erroneous conclusions of law or fact. Our adherence to this rule is unwavering and we do not find any extraordinary or compelling circumstances in the present case which would permit a review. In fact, this Court in its long history, has never found such circumstances to exist.

*Love v. State,* 95 Md.App. 420, 426, 621 A.2d 910, *cert. denied,* 331 Md. 480, 628 A.2d 1067 (1993). Recently, this Court has questioned whether a trial court's actual exercise of discretion in denying a motion for new trial is reviewable at all. *See Isley v. State,* 129 Md.App. 611, 743 A.2d 772 (2000). Assuming for the purposes of this opinion that it is, we find no error in the trial court's decision.

### A.

■ Appellant argues that he was inadequately represented by Mr. Hannigan, his trial counsel, because Mr. Hannigan's "simultaneous representation of both [appellant] and [his co-defendant] constituted an inherent and unavoidable conflict of interest that was prejudicial to [appellant]." Appellant argues that, at his new trial hearing, the contradictory testimony of Mr. Hannigan and a possible witness "indicated that Mr. Hannigan may not have competently evaluated whether [that] witness should be called as a defense witness at trial." Appel-

lant argues that, because of this contradiction, the court erred in rejecting his new trial motion.

 Normally, appellate review of a trial attorney's conduct is best done in post-conviction proceedings, rather than on direct appeal, where a trial-like setting will "provide[ ] the opportunity to develop a full record concerning relevant factual issues, particularly the basis for the challenged conduct by counsel." *Walker v. State*, 338 Md. 253, 262, 658 A.2d 239, *cert. denied*, 516 U.S. 898, 116 S.Ct. 254, 133 L.Ed.2d 179 (1995). At appellant's new trial hearing, however, the court heard testimony and accepted evidence regarding appellant's ineffective assistance of counsel claim. Because we are presented with a full record, we shall entertain the question posed.

The right to assistance of an attorney in a criminal trial is guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution. *See State v. Renshaw*, 276 Md. 259, 264, 347 A.2d 219 (1975). "The right to counsel is the right to effective assistance of counsel, the benchmark of which is whether counsel's advocacy was sufficient to maintain confidence that the adversarial process was capable of producing a just result." *Cirincione v. State*, 119 Md.App. 471, 484, 705 A.2d 96, *cert. denied*, 350 Md. 275, 711 A.2d 868 (1998). When reviewing a claim of ineffective assistance of counsel, we apply the test outlined by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Wiggins v. State*, 352 Md. 580, 724 A.2d 1, *cert. denied*, —— U.S. ——, 120 S.Ct. 90, 145 L.Ed.2d 76 (1999). That test provides that to establish an ineffective assistance of counsel claim appellant must demonstrate both that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052; *Wiggins*, 352 Md. at 602, 724 A.2d 1.

"To demonstrate deficient performance, appellant must prove 'that his counsel's acts or omissions were the result of unreasonable professional judgment and that counsel's performance, given all the circumstances, fell below an objective

standard of reasonableness considering prevailing professional norms.'" *Cirincione,* 119 Md.App. at 484, 705 A.2d 96 (*quoting Oken v. State,* 343 Md. 256, 283, 681 A.2d 30 (1996), *cert. denied,* 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 681 (1997)). The specific burden of prejudice appellant must show is "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. We have said that "[a] reasonable probability of a different outcome is, consistent with the purposes of the guarantee of counsel at trial, 'a probability sufficient to undermine confidence in the outcome.'" *Cirincione,* 119 Md.App. at 485, 705 A.2d 96 (*quoting Strickland,* 466 U.S. at 693, 104 S.Ct. 2052).

An attorney's dual representation of clients is not *per se* violative of the constitutional guarantee to effective assistance of counsel.[3] *Holloway v. Arkansas,* 435 U.S. 475, 482, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978); *Pugh v. State,* 103 Md.App. 624, 654 A.2d 888, cert. denied, 339 Md. 355, 663 A.2d 73 (1995). Moreover, the "mere possibility" of conflict is insufficient to impugn a criminal conviction. *Cuyler v. Sullivan,* 446 U.S. 335, 350, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). Rather, "[i]n order to demonstrate a violation of his Sixth

---

**3.** Rule 1.7 of the Maryland Rules of Professional Conduct provides:

(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

(1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

(2) each client consents after consultation.

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client ..., unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents after consultation.

(c) The consultation required by paragraphs (a) and (b) shall include explanation of the implications of the common representation and any limitations resulting from the lawyer's responsibilities to another, ... as well as the advantages and risks involved.

*See also* Rule 1.16(a) ("a lawyer shall withdraw from the representation of a client if ... the representation will result in violation of the Rules of Professional Conduct ...").

Amendment rights, a defendant must establish [that] an actual conflict of interest adversely affected his lawyer's performance." *Id.*

At appellant's new trial hearing, Mr. Hannigan, appellant's trial attorney, testified that while representing appellant, Mr. Brown also asked him for representation. Mr. Hannigan testified that he told appellant of Mr. Brown's request and explained to appellant the advantages and disadvantages of such a representation. Appellant agreed to co-representation. Mr. Hannigan testified that he perceived no conflict because neither defendant was accusing the other of the crime and the best defense for both cases was the same, i.e., Ms. Stangle's lack of credibility. Mr. Hannigan testified that he spoke to Heather Fiorita, the mother of appellant's child, about testifying as a possible witness but decided not to call her because she would not be a helpful witness for appellant. In addition, Mr. Hannigan testified that when the defendants' case was called for trial, both appellant and Mr. Brown agreed, on the record, to joint representation.[4]

Ms. Fiorita testified at appellant's new trial hearing. She testified that Mr. Hannigan never contacted her about being a witness. There was no proffer of what she would have said, if she had been called to testify at appellant's trial.

Appellant argued to the court that his new trial motion should be granted on the grounds of ineffective assistance of counsel for two reasons: 1) that joint representation is inher-

---

4. A review of the record shows that when appellant's case was called for trial, the following colloquy occurred in court:

THE COURT: Alright. Do we now have Mr. Brown and [appellant] here? Mr. Hannigan, once again, you're representing both Defendants in this case?

[MR. HANNIGAN]: Yes sir. It's my intention to represent both Mr. Brown and [appellant]. Each has indicated to me, in their belief, that that's in their joint best interest.

THE COURT: Is that correct, [appellant], you desire Mr. Hannigan to represent you and Mr. Brown together?

DEFENDANT RUTH: Yes sir.

THE COURT: And how about you, Mr. Brown?

DEFENDANT BROWN: Yes sir.

ently prejudicial and 2) the discrepancy between Ms. Fiorita's and Mr. Hannigan's testimony indicated that Mr. Hannigan had not acted in his best interest.

After taking evidence and hearing argument, the court made the following findings:

> I find, based on my recollection of the trial, the manner in which Mr. Hannigan conducted himself on cross[-]examining witnesses, the argument produced by Mr. Hannigan, the tactics utilized that indeed there was no deficiency in his actions, even if he was representing both Defendants at the same time. He also testified that he discussed the joint representation of [appellant] and Mr. Brown, discussed it in detail, went into the pros and cons of such representation, and that [appellant] agreed nevertheless. Once again, based on everything that I recall about the trial and the manner in which Mr. Hannigan tactically worked on the case, ... there is neither deficiency nor certainly prejudice to [appellant] himself as a result of the representation of Mr. Brown jointly.

We find that the trial court thoroughly considered appellant's arguments, and we find no error in the court's ruling.

As stated above, joint representation is not *per se* unconstitutional. Moreover, appellant has failed to show how the inconsistent testimony of Ms. Fiorita and Mr. Hannigan rose to the level of ineffective assistance of counsel. A review of the trial strategies, the theory of the case, and Mr. Hannigan's defense of both appellant and Mr. Brown leads us to conclude that no actual conflict arose, and Mr. Hannigan's representation was adequate. Accordingly, appellant's claim of ineffective assistance of counsel is meritless.

### B.

Appellant also argued at his new trial hearing that, because a juror engaged in improper conduct, he was entitled to a new trial. Because appellant created the improper conduct and apparently benefitted from the conduct, the trial

court denied appellant's motion. Appellant argues that the ruling was in error. We disagree.

To fully appreciate the chutzpah of appellant's argument, a brief synopsis of the jury empaneling process is needed. The court asked the prospective jurors whether they were acquainted with, among others, appellant. Although one of the jurors, Shelley Robertson, had known appellant since childhood and was a roommate of Ms. Fiorita, the mother of appellant's child, Ms. Robertson did not inform the court of her knowledge. She was ultimately chosen as a juror and sat on appellant's jury. Other than appellant and Ms. Robertson, no one was aware of this situation at the time.

Mr. Hannigan testified at appellant's new trial hearing that he was unaware of the situation until near the end of trial. He testified that when he was notified that the jury had reached a verdict, he told appellant, "We may have some trouble with this verdict." Appellant responded, "I have nothing to worry about. I'm in with one of the jurors." Both Mr. Hannigan and Mr. Brown were taken aback by appellant's response. Although appellant and Mr. Brown were each charged with conspiracy to commit theft of property valued at more than $300, four counts of theft of property valued at $300 or less, and malicious destruction of property, the jury found appellant guilty only of conspiracy to commit felony theft but found Mr. Brown guilty of each crime charged.

Mr. Hannigan testified that, several days after the trial, Ms. Robertson approached him and

> indicated it was her intent to have [appellant] found guilty of nothing and that it was only when the Foreman told her that the worst he'd get is probation, he was in court two days earlier and that's all that happened. Judge McDowell was going to keep them through the holiday weekend they'd hate her if she—if she didn't, and they'd make her life hell if she didn't go along with something.

Ms. Robertson told Mr. Hannigan that she sat down with appellant the night before trial and discussed his case. After

speaking with Ms. Robertson, Mr. Hannigan withdrew his representation.

During his new trial hearing, appellant argued that contrary to the evidence that he benefitted from Ms. Robertson's presence on the jury he was actually prejudiced. He argued that because he and Ms. Fiorita were on the "outs" during his trial, and because Ms. Fiorita and Ms. Robertson were roommates during this time, it was likely that Ms. Robertson had "evil in her heart" while deliberating on his case.

After hearing argument and taking evidence, the court made the following findings:

> It's obvious that [appellant] sought to benefit from this Juror that he knew being on the Jury Panel. And it's obvious to the Court that the same implicit understanding was held by the Juror. It's obvious as well to this Court that to call that Juror into court at this time, with a potential of an obstruction of justice charge being lodged against her, even if we would find her to come in to testify, may be useless. But it's obvious to the Court that there was some misconduct of a Juror that was known by [appellant] to which he sought to benefit, that he assumed he was going to benefit and apparently he did benefit from the Jury verdict. And the Court believes, under the circumstances of this case, that he indeed invited this error and benefitted from the error and the State has met its burden to indicate that [appellant] benefitting from the error from the Juror misconduct and from his knowledge of the Juror misconduct throughout the trial cannot now complain that the Jury returned a verdict that it did.

The court then denied appellant's new trial motion based on jury misconduct.[5] We again find no error in the court's ruling.

---

5. Appellant filed his motion for a new trial jointly with Mr. Brown. The court granted the motion as to Mr. Brown on the basis of juror misconduct.

"The potency of the Sixth Amendment right to a fair trial relies on the premise that a defendant's fate will be determined by an impartial fact finder who depends solely on the evidence and argument introduced in open court." *Allen v. State*, 89 Md.App. 25, 42, 597 A.2d 489 (1991), *cert. denied*, 325 Md. 396, 601 A.2d 129 (1992) (citations omitted). The term "invited error" is a concept that a defendant who himself invites or creates error cannot obtain a benefit—mistrial or reversal—from that error. *Allen*, 89 Md.App. at 43, 597 A.2d 489 (citations omitted). In *Allen*, we cited several cases with fact patterns similar to our case:

[In *State v. Bonaparte*, 222 Neb. 469, 384 N.W.2d 304 (1986) ], the Supreme Court of Nebraska declined to grant a new trial to a defendant who approached a juror during his trial, offered her a ride home, then drove her by the scene of his arrest and discussed the case with the juror. The court held that the defendant's call for a new trial out of concern for the integrity of the judicial system represented the "height of 'chutzpah.' " *Id.*, 384 N.W.2d at 305. "It would be a strange, if not ridiculous, rule of law which would hold that a criminal defendant may be entitled to a new trial based upon jury misconduct when such misconduct is initiated by the defendant himself." *Id.*, 384 N.W.2d at 306. Similarly, in *Phillips v. State*, 443 So.2d 1328 (Ala.Crim.App. 1983) the Alabama Court of Criminal Appeals refused to grant a new trial to a defendant who, prior to and during the trial, contacted a nonjuror friend and persuaded the friend to contact a juror. While the contents of the discussions between the defendant's friend and the juror were disputed, the court refused to grant a new trial because the defendant "certainly cannot be allowed to benefit by his own misconduct." *Id.*, 443 So.2d at 1331. "To allow such," it said, "would be absurd." *Id.* [Footnote omitted which cites several other cases with the same result].

The evidence in the record indicates that appellant participated or, at the very least, acquiesced in the juror misconduct. Moreover, despite appellant's protestations to the contrary, there was no evidence that appellant was harmed. Rather,

appellant apparently benefitted by the misconduct, being found guilty on only one count whereas his co-defendant was found guilty on six. Appellant's plea for a fair and impartial fact finder rings hollow, as he now seeks an impartial jury as a last resort. To grant appellant a new trial under such circumstances would reward him for manipulating, albeit not to his complete satisfaction, the jury in his first trial.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**