923 A.2d 81

**Juwaughn Alexander DUVALL**

v.

**STATE of Maryland.**

**No. 77, Sept. Term, 2006.**

Court of Appeals of Maryland.

May 15, 2007.

Brian L. Zavin, Asst. Public Defender (Nancy S. Forster, Public Defender, on brief), for petitioner.

Steven L. Holcomb, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen., on brief), for respondent.

Argued before RAKER, CATHELL, HARRELL, BATTAGLIA, GREENE, JOHN C. ELDRIDGE (Retired, Specially Assigned), and ALAN M. WILNER (Retired, Specially Assigned), JJ.

GREENE, J.

This matter arises from the administrative judge's denial of defense counsel's request for a continuance prior to trial because of defense counsel's conflict of interest. Juwaughn Alexander Duvall ("Petitioner") was convicted in the Circuit Court for Montgomery County, after a jury trial, of first degree burglary, conspiracy to commit first degree burglary, attempted robbery with a dangerous and deadly weapon, and first degree assault.

We conclude that a conflict of interest existed in this case. Petitioner denied the charges filed against him. He informed his defense counsel that another individual, who was represented by the Montgomery County Office of the Public Defender, on unrelated charges, was in fact responsible for the crimes for which Petitioner had been charged. Because there existed a conflict of interest and defense counsel requested a

continuance prior to trial, the administrative judge erred, as a matter of law, in failing to grant the postponement to allow defense counsel a reasonable time to resolve the conflict. Petitioner is therefore entitled to a reversal of his convictions and a new trial. Because of this holding, we need not address the propriety of the trial court's actions during the trial.

## FACTUAL AND PROCEDURAL BACKGROUND

For approximately one year, Alidad Chacon had been selling marijuana from the basement of a house that he shared with his mother, sister, and nephew in Montgomery County, Maryland. He stored the marijuana in a safe behind a curtain in his bedroom, which was located in the basement, and sold the marijuana only to close friends. In June, 2003, two men broke into the house with the intent to steal the marijuana. Chacon's nephew, Ruben Mesones, saw the intruders when he went to the laundry room in the basement of the house. Mesones described one of the men as bald or nearly bald, approximately 5′6″ tall, in his 20s, and wearing a camouflage mask, camouflage gloves, and a black t-shirt. At trial, Mesones identified this man as Petitioner. The other man was taller, heavier, had darker skin and was wearing a "do-rag" and a cap.

The man wearing the mask tried to throw Mesones down on the ground so Mesones shouted to his aunt to call the police. When trying to stand up, Mesones was hit on the head twice with a gun by the man wearing the cap. The man with the cap broke down Chacon's door, pointed a gun at him, and asked where the safe was, while the man with the mask ran upstairs. Chacon subsequently opened the safe. The man with the cap took the contents of the safe—a digital scale and approximately two ounces of marijuana—and fled into the yard through the basement door.

Mesones chased after the man with the mask and caught him on the stairs. Mesones's aunt helped Mesones restrain the individual and then removed his mask. The man exclaimed that he knew them. Mesones's aunt told Mesones to

let the man go and the man ran out the front door. Mesones and his aunt went to a police officer's house who lived nearby and described to the officer the man with the mask. The officer called the police station and the aunt told the 911 operator that she knew the name of the man with the mask because he was the father of her friend's baby; she identified him as Petitioner. The aunt explained that she had met him only once, at a nightclub, a few years prior and had photographs from that night. She showed the photographs to the police.

Chacon told the police that this was not the first time that someone had stolen drugs from him. He explained that Adam Muse, an acquaintance who was familiar with the safe and its contents, had stolen the drugs from Chacon's bedroom on an earlier occasion. Chacon, Mesones, and Mesones's aunt, who also knew Muse, claimed that Muse was not the man in the mask on the night in question.

Petitioner was arrested on August 25, 2003 and was interrogated by the police. He asked why he was arrested and thought that it was because he owed $12,000 in child support. Petitioner's mother testified that Petitioner and his friend had driven from Virginia to Germantown, Maryland to help her move into her new home on the date of the incident. She testified that they were with her all day and, further, that her son had never shaved his head bald.

Petitioner was represented by an attorney from the Office of the Public Defender located in Montgomery County. His counsel's theory was that Petitioner was not the man with the mask who broke into Chacon's home, but that Muse was that man. Petitioner argued that he was not at the scene of the crime and that it was a case of mistaken identity. Further, he asserted that Muse fit the physical description that Mesones had given of the man in the mask, had committed a similar crime at that exact location on a previous occasion, and had knowledge of the marijuana in the basement safe. In addition, Petitioner is approximately 6 feet tall, while Muse is approximately 5'6" tall.

When Petitioner's attorney learned that Muse was being represented by another attorney from the Montgomery County Office of the Public Defender in a pending robbery case, she filed a motion for a continuance with the court, on January 15, 2004, more than two months in advance of the 180 day deadline.[1] The administrative judge denied the written motion on January 23, 2004. The motion was renewed on the scheduled trial date, January 27, 2004. At the hearing before the administrative judge on that date, defense counsel explained that she filed the motion for a continuance "for the purpose of securing a panel attorney to represent [Petitioner] and that a Status Conference be set to set a trial date."[2] At the hearing, defense counsel stated to the judge that "[t]he problem arises, Your Honor, in the fact that my office repre-

---

1. Md. R.Crim. Causes 4–271 states, in pertinent part:
 (1) The date for trial in the circuit court shall be set within 30 days after the earlier of the appearance of counsel or the first appearance of the defendant before the circuit court pursuant to Rule 4–213, and *shall be not later than 180 days* after the earlier of those events. When a case has been transferred from the District Court because of a demand for jury trial, and an appearance of counsel entered in the District Court was automatically entered in the circuit court pursuant to Rule 4–214(a), the date of the appearance of counsel for purposes of this Rule is the date the case was docketed in the circuit court. On motion of a party, or on the court's initiative, and for good cause shown, the county administrative judge or that judge's designee may grant a change of a circuit court trial date. If a circuit court trial date is changed, any subsequent changes of the trial date may be made only by the county administrative judge or that judge's designee for good cause shown.
 (Emphasis added.) This rule is known commonly as the *Hicks* rule. *State v. Hicks*, 285 Md. 310, 403 A.2d 356 (1979). Defense counsel entered her appearance on September 26, 2003, and Petitioner first appeared before the court on November 7, 2003. In accordance with *Hicks*, Petitioner must have been tried on or before March 24, 2004, unless the administrative judge or the judge's designee found good cause to extend the trial date beyond *Hicks*.

2. We note that defense counsel in the case *sub judice* could have, instead, filed a motion to withdraw from the case as a result of the conflict of interest, pursuant to Maryland Rule 4–214(c), entitled "Striking appearance." By filing a motion for a continuance, so that the case could be re-assigned to a panel attorney, defense counsel essentially did just that.

sents both [Petitioner] at this time and a man named Adam M[use]." Defense counsel explained that the case was one of mistaken identity and that Adam Muse is very possibly the man who actually committed the crimes, not Petitioner. Defense counsel then explained the nature of the conflict. She said:

> My office represents Mr. M[use]. Therefore, I could not ask—[sic] Ron Gottlieb represents him for a trial that's set next week. I could not ask for permission to speak with him because even doing that would be a conflict. I could not review our file on the case because that would be a conflict. I could not review the picture of Mr. M[use] in our file because that would be a conflict, and I could not in any way talk with Mr. M[use]. I'm not saying Mr. M[use] would absolutely talk to me in this case. Obviously, he could decide not to. But I hadn't, I don't even have the opportunity to ask him.
>
> \* \* \* \* \* \*
>
> I very infrequently in 11 years have thought that something was a conflict. There are people I know who find conflicts out of nothing. I don't.

The administrative judge denied the continuance. She stated:

> Okay. Well, this is why I ruled that way. Your trial is first ... If there's a conflict, then Mr. Gottlieb can move to continue M[use]'s case and remove himself from that case [3] .... But I don't want to get into Catch–22 [sic] where you both point fingers at the other—and both try to move cases. . . .

Petitioner's attorney then reiterated that she felt there existed a conflict of interest. The administrative judge asked Petitioner whether he wanted the case continued. Petitioner explained that he did not want a continuance and would proceed without counsel because he has five children and "a good job waiting on [him]." He stated that he was "ready to go without counsel" because he knew where he was on the

---

3. Muse's trial was set for February 2, 2004.

date in question. The judge asked Petitioner whether he understood the charges against him and he explained that he did. The judge announced the charges and their mandatory sentences and Petitioner again explained that he understood the charges. He stated, however, that he did not understand "all these postponements and continuances." The court thereafter told Petitioner that his attorney was requesting a continuance to talk to someone who she felt she could not speak to because someone in her office represented him in another case.

The State argued that defense counsel's request for a continuance was improper and not relevant to the case. The State explained that each witness would testify that Muse was not the man in the house and argued that defense counsel was therefore making a "last-second attempt to get a postponement." The administrative judge responded by stating:

Well, I think [defense counsel] is doing what she is supposed to do, and that's zealously represent the interests of her client. She has made her motion and this, [sic] basically she is renewing it today on the day of trial. I'm going to deny the motion to continue. She is still counsel of record, and I'll find out who is available and send you for trial.

Petitioner's attorney again renewed her motion before the judge assigned to preside at Petitioner's trial. The trial judge denied defense counsel's motion for a continuance.[4] The trial proceeded and, after a jury trial, Petitioner was convicted of first degree burglary, conspiracy to commit first degree burglary, attempted robbery with a dangerous and deadly weap-

---

4. As a practical matter, only the administrative judge or her designee had the authority to grant the continuance. Thus, it is not dispositive that the trial judge denied the motion to continue. *See* Md. R.Crim. Causes 4–271(a) (stating that "[o]n motion of a party, or on the court's initiative, and for good cause shown, the county *administrative judge or that judge's designee* may grant a change of a circuit court trial date") (emphasis added). *See also Goldring v. State,* 358 Md. 490, 505, 750 A.2d 1, 9 (2000) (holding that charges were properly dismissed because the case was improperly postponed by a circuit court judge, and not an administrative judge or his or her designee). It is dispositive that the judge with the authority to grant the postponement, denied the request.

on, and first degree assault. Petitioner filed a motion for a new trial, which the court denied. Thereafter, Petitioner was sentenced to a concurrent 10–year term of imprisonment for each of his convictions.

Petitioner filed a timely appeal to the Court of Special Appeals. The intermediate appellate court affirmed the judgment of the Circuit Court in an unreported opinion. Petitioner filed a petition for writ of certiorari in this Court, which we granted.[5] *Duvall v. State,* 395 Md. 420, 910 A.2d 1061 (2006).

## DISCUSSION

We conclude that a conflict of interest existed and, therefore, the administrative judge erred, as a matter of law, when she denied defense counsel's motion for a continuance. Because of our holding, we need to answer only Petitioner's first question. We therefore address only the parties' arguments that deal specifically with that question. Petitioner argues that "[b]y forcing defense counsel to go to trial while she was laboring under a conflict of interest which prevented her from zealously representing her client, the Circuit Court denied [Petitioner] his right to the effective assistance of counsel." Petitioner contends that because the theory of his case was that Adam Muse committed the robbery and not Petitioner, and because Muse was being represented by another public

---

**5.** Petitioner presented the following questions in his petition for writ of certiorari:

1. Was Petitioner deprived of his right to the effective assistance of counsel where the trial court denied defense counsel's request for a continuance after counsel learned that the individual who the defense contended was responsible for the charged offenses was also represented by the Office of the Public Defender?

2. Was Petitioner deprived of his right to present a defense by the trial court's decision to prohibit him from calling as a witness the individual who the defense contended was responsible for the charged offenses, or, in the alternative, from introducing extrinsic evidence that the individual had the opportunity to commit the offenses and was in jail at the time of trial on charges of committing a similar offense?

3. Did the trial court err in admitting irrelevant and prejudicial evidence that Petitioner was unemployed, homeless, and behind in his child support payments at the time of the offenses?

defender from the Montgomery County Office of the Public Defender at the time of Petitioner's trial, there existed a conflict of interest in his case. According to Petitioner, the administrative judge should have granted his attorney's motion for a continuance because of the existence of this conflict. Petitioner argues that he is, therefore, entitled to a new trial.

The State counters that Petitioner's argument is without merit because there did not exist a conflict in this case. The State contends that there is no conflict because the State's witnesses all explained that, if called to testify, they would state that they knew Adam Muse and that Muse was not present during the robbery in question. In addition, according to the State, there was no conflict because Muse was not a co-defendant, not the State's witness, and was not involved in Petitioner's case, other than the fact that Petitioner wrote Muse's name on his proposed witness list for purposes of voir dire. The State avers, therefore, that the administrative judge properly denied the motion for a continuance. Moreover, the State contends that because Petitioner elicited evidence concerning Muse during trial and attempted to shift the blame to Muse during closing arguments, Petitioner's defense was not impaired.

We agree with Petitioner that his counsel's predicament created an actual conflict of interest and that, therefore, the administrative judge should have granted defense counsel's motion for a continuance. Because defense counsel's theory at trial was that Muse was the perpetrator of the robbery, rather than Petitioner, and because Muse was being represented by an attorney who also worked in the Montgomery County Office of the Public Defender, there existed, at the very least, a strong potential for a conflict of interest; we believe, however, in this case, that an actual conflict of interest existed. Therefore, Petitioner is entitled to a new trial and we reverse the judgment of the Court of Special Appeals.

*The Right to Effective Assistance of*
*Counsel Free from Conflicts*

■ "The Sixth Amendment to the United States Constitu-

tion [6] and Article 21 of the Maryland Declaration of Rights,[7] as a safeguard necessary to ensure fundamental human rights of life and liberty, guarantee to any criminal defendant the right to have the assistance of counsel." *Lettley v. State,* 358 Md. 26, 33, 746 A.2d 392, 396 (2000). The Supreme Court has explained that " 'the right to counsel is the right to the effective assistance of counsel.' " *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674, 692 (1984) (citations omitted); *accord Mosley v. State,* 378 Md. 548, 557, 836 A.2d 678, 683 (2003); *In re Parris W.,* 363 Md. 717, 724, 770 A.2d 202, 206 (2001); *State v. Tichnell,* 306 Md. 428, 440, 509 A.2d 1179, 1185 (1986). "This right has been accorded, [the Supreme Court] ha[s] said, 'not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial.' " *Mickens v. Taylor,* 535 U.S. 162, 166, 122 S.Ct. 1237, 1240, 152 L.Ed.2d 291, 300 (2002) (*quoting United States v. Cronic,* 466 U.S. 648, 658, 104 S.Ct. 2039, 2046, 80 L.Ed.2d 657, 667 (1984)).

■ Moreover, in *Austin v. State,* 327 Md. 375, 381, 609 A.2d 728, 730–31 (1992), we stated that "[t]he constitutional right to counsel, under the Sixth Amendment and Article 21 of the Maryland Declaration of Rights, includes the right to have counsel's representation free from conflicts of interest." *(citing Wood v. Georgia,* 450 U.S. 261, 271, 101 S.Ct. 1097, 1103, 67 L.Ed.2d 220, 230 (1981)); *accord Lettley,* 358 Md. at 34, 746 A.2d at 396; *Graves v. State,* 94 Md.App. 649, 656, 619 A.2d 123, 126 (1993). Furthermore, "[a] defense attorney's representation must be untrammeled and unimpaired, unrestrained by commitments to others; counsel's loyalty must be undivid-

---

6. The Sixth Amendment provides in pertinent part:
 In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence [sic].
 U.S. CONST. amend. VI.

7. Article 21 of the Maryland Declaration of Rights provides in pertinent part:
 That in all criminal prosecutions, every man hath a right . . . to be allowed counsel. . . .
 Md. Decl. Rts. art. 21.

ed, leaving counsel free from any conflict of interest." *Lettley*, 358 Md. at 34, 746 A.2d at 396. The Maryland Rules of Professional Responsibility also prohibit attorneys from representing a client if that representation involves a conflict of interest.[8]

To establish a violation of the constitutional right to the effective assistance of counsel, a defendant must prove both that his or her attorney's representation was deficient and that he or she was prejudiced as a result of that deficiency. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 696. We have explained, however, that:

> A narrow exception to the *Strickland* standard exists where defendant's ineffective assistance claim is based on a conflict of interest. . . . In addressing an ineffective assistance claim alleging conflict of interest, we do not apply the *Strickland* two-pronged test but rather a more lenient standard that does not require a showing of prejudice.

*Lettley*, 358 Md. at 34–35, 746 A.2d at 397. In *Lettley*, 358 Md. at 35–39, 746 A.2d at 397–99, we outlined the three significant Supreme Court cases regarding the ineffective assistance of counsel resulting from conflicts of interest. Writing for the majority, Judge Raker explained:

---

8. Rule 1.7, entitled "Conflict of Interest: General Rule," states:

 (a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a conflict of interest. A conflict of interest exists if:

 (1) the representation of one client will be directly adverse to another client; or

 (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

 (b) Notwithstanding the existence of a conflict of interest under paragraph (a), a lawyer may represent a client if:

 (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client.

 (2) the representation is not prohibited by law.

 (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and.

 (4) each affected client gives informed consent, confirmed in writing.

In *Glasser*, which is sometimes referred to as the watershed conflict of interest case, the Supreme Court, in the context of co-defendants, reversed Glasser's conviction primarily on the grounds that Glasser's counsel "struggle[d] to serve two masters" because his conflict of interest violated Glasser's right to effective assistance of counsel. *See Glasser*, 315 U.S. at 75, 62 S.Ct. 457. The Court noted that the possibility of the inconsistent interests of Glasser and the co-defendant was "brought home" to the court, but instead of jealously guarding Glasser's rights, the court created the conflict by appointing, over objection, counsel with conflicting interests, thereby depriving Glasser of his right to have the benefit of undivided assistance of counsel. *See id.* at 71, 62 S.Ct. 457. As to Glasser's prejudice, the Court said:

> To determine the precise degree of prejudice sustained by Glasser as a result of the court's appointment of Stewart as counsel for [a co-defendant] is at once difficult an d unnecessary. The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial.

*Id.* at 75–76, 62 S.Ct. 457.

In *Holloway*, again in the context of co-defendants at trial, the Supreme Court reversed a conviction on the ground that counsel's conflict of interest deprived the defendants of effective assistance of counsel. Three defendants were on trial for robbery and rape, in a consolidated trial. Defense counsel asked the court before trial to appoint separate counsel for the three defendants, the request based on the defendants' statements to him that there was a possibility of a conflict of interest in each of their cases. The trial court denied defendants' requests and the case proceeded to trial. All three defendants were convicted. The Supreme Court noted that trial counsel, as an officer of the court, alerted the court to the conflict, and focused explicitly on the probable risk of a conflict of interests. *See Holloway*, 435 U.S. at 484, 98 S.Ct. 1173. The trial court, however, "failed either to appoint separate counsel or to take adequate steps

to ascertain whether the risk was too remote to warrant separate counsel." *Id.* The Court held that this "failure, in the face of the representations made by counsel weeks before trial and again before the jury was empaneled, deprived petitioners of the guarantee of 'assistance of counsel.' " *Id.* Recognizing that joint representation is not per se violative of the constitutional guarantee of effective assistance of counsel, the Court nonetheless said that "since the decision in *Glasser*, most courts have held that an attorney's request for the appointment of separate counsel, based on his representations as an officer of the court regarding conflict of interests, should be granted." *Id.* at 485, 98 S.Ct. 1173.

Turning to the question of proof of prejudice, the *Holloway* Court concluded that prejudice is presumed, regardless of whether it was shown independently. *See id.* at 489, 98 S.Ct. 1173. The Court "read the Court's opinion in *Glasser* ... as holding that whenever a trial court improperly requires joint representation over timely objection reversal is automatic." *Id.* at 488, 98 S.Ct. 1173. The Court recognized that joint representation of conflicting interests is suspect because of what it tends to prevent the attorney from doing, and that a rule requiring a defendant to show that a conflict, which he and his counsel tried to avoid by timely objection, prejudiced him in some specific fashion would not be susceptible of intelligent, evenhanded application. *See id.* at 490, 98 S.Ct. 1173. Again rejecting a harmless error standard, the Court said:

> But in a case of joint representation of conflicting interests the evil—it bears repeating—is in what the advocate finds himself compelled to *refrain* from doing, not only at trial but also as to possible pretrial plea negotiations and in the sentencing process. It may be possible in some cases to identify from the record the prejudice resulting from an attorney's failure to undertake certain trial tasks, but even with a record of the sentencing hearing available it would be difficult to judge intelligently the impact of a conflict on the attorney's representation of a client. And

to assess the impact of a conflict of interests on the attorney's options, tactics, and decisions in plea negotiations would be virtually impossible. Thus an inquiry into a claim of harmless error here would require, unlike most cases, unguided speculation.

*Id.* at 490–91, 98 S.Ct. 1173.

Two years later, the Supreme Court again addressed the conflict of interest issue, in *Cuyler*. In *Cuyler*, the potential conflict of interest was not brought to the trial court's attention. Three co-defendants were jointly represented by two attorneys. Sullivan did not object to the multiple representation until after he was convicted and he moved for post-conviction relief on the grounds that he was denied effective assistance of counsel. In establishing a standard to be applied to cases in which the potential conflict is not brought to the trial court's attention, the Supreme Court held that "in order to establish a violation of the Sixth Amendment, a defendant *who raised no objection at trial* must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." 446 U.S. at 348, 100 S.Ct. 1708 (emphasis added). In this context, "the possibility of conflict is insufficient to impugn a criminal conviction." 446 U.S. at 350, 100 S.Ct. 1708. Commenting on *Glasser*, the Court held:

Glasser established that unconstitutional multiple representation is never harmless error. Once the Court concluded that Glasser's lawyer had an actual conflict of interest, it refused to "indulge in nice calculations as to the amount of prejudice" attributable to the conflict. The conflict itself demonstrated a denial of the "right to have the effective assistance of counsel." 315 U.S. at 76, 62 S.Ct. at 467. Thus, a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief. But until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance.

446 U.S. at 349–50, 100 S.Ct. 1708. Contrary to the resolution in *Holloway,* Sullivan, who did not object before trial, was required to show that an actual conflict of interest adversely affected his lawyer's performance.

To date the Supreme Court has never squarely resolved the question of whether proof of an adverse effect of a conflict of interest is required to reverse a conviction. *See e.g., Bonin v. California,* 494 U.S. 1039, 1043, 110 S.Ct. 1506, 108 L.Ed.2d 641 (1990) (Marshall, J., dissenting). Numerous cases in other jurisdictions addressing conflict of interest conclude, however, that the time at which a conflict of interest, or a potential one, is raised and is brought to the court's attention governs how this issue is to be treated. *See, e.g., Selsor v. Kaiser,* 22 F.3d 1029, 1032 (10th Cir. 1994); *United States v. Fish,* 34 F.3d 488, 492 (7th Cir. 1994); *Hamilton v. Ford,* 969 F.2d 1006, 1011 (11th Cir. 1992); *People v. Burchette,* 257 Ill.App.3d 641, 628 N.E.2d 1014, 1023, 195 Ill.Dec. 550 (1994); *State v. Wille,* 595 So.2d 1149, 1153 (La.1992), *cert. denied,* 506 U.S. 880, 113 S.Ct. 231, 121 L.Ed.2d 167 (1992); *State v. Marshall,* 414 So.2d 684, 687 (La.1982); *State v. Lemon,* 698 So.2d 1057, 1061 (La.Ct.App.1997); *State v. Dillman,* 70 Ohio App.3d 616, 591 N.E.2d 849, 852 n. 1 (1990). See also CHARLES W. WOLFRAM, MODERN LEGAL ETHICS § 8.2, at 414 (1986) ("The different, and lesser, showing that obtained reversal in *Holloway* depended on the lawyer's trial objection there."). The cases reason that when a possible conflict exists, but the trial court is not advised of the conflict in a timely manner, the *Cuyler* standard applies. In order to establish a violation of the Sixth Amendment right to effective assistance of counsel, the defendant must show that an actual conflict of interest adversely affected his lawyer's performance. On the other hand, when the defendant advises the trial court of the possibility of a conflict of interest, the *Glasser/Holloway* standard applies. "[A] court confronted with and alerted to possible conflicts of interest must take adequate steps to ascertain whether the conflicts warrant separate counsel." *Wheat v. United States,* 486

U.S. 153, 160, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). The trial court is required to "either appoint separate counsel, or to take adequate steps to ascertain whether the risk was too remote to warrant separate counsel." *Holloway*, 435 U.S. at 484, 98 S.Ct. 1173. If the trial court fails to take "adequate steps" or improperly requires joint or dual representation, then reversal is automatic, without a showing of prejudice, or adverse effect upon the representation.

After this Court's decision in *Lettley*, the Supreme Court decided *Mickens v. Taylor*, 535 U.S. 162, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002). In *Mickens*, the Supreme Court evaluated, with regards to the constitutional right to the effective assistance of counsel, whether the criminal defendant was entitled to the automatic reversal of a conviction when the trial judge failed to inquire into a potential conflict of interest. The Court reviewed its prior decisions and explained, as the State points out, that *Holloway* "creates an automatic reversal rule only where defense counsel is forced to represent co[ ]defendants over his [or her] timely objection, unless the trial court has determined that there is no conflict." *Mickens*, 535 U.S. at 168, 122 S.Ct. at 1241–42, 152 L.Ed.2d. at 302. The Supreme Court also explained, however, that for Sixth Amendment purposes, " 'an actual conflict of interest,' mean[s] precisely a conflict *that affect[s] counsel's performance*—as opposed to a mere theoretical division of loyalties." *Mickens*, 535 U.S. at 171, 172 n. 5, 122 S.Ct. at 1243, 1244 n. 5, 152 L.Ed.2d. at 304, 304 n. 5. The Court ultimately held that the criminal defendant had to establish that the *potential* conflict of interest adversely affected his counsel's performance before he would be entitled to reversal.[9] This last principle is essential to our analysis of the case *sub judice,* as we have determined that an actual conflict of interest existed.

---

**9.** The Supreme Court made clear the breadth of its holding by stating "[l]est today's holding be misconstrued, we note that the only question presented was the effect of a trial court's failure to inquire into a *potential* conflict ..." *Mickens v. Taylor,* 535 U.S. 162, 174, 122 S.Ct. 1237, 1245, 152 L.Ed.2d 291, 307 (2002).

This Court addressed ineffectiveness of counsel due to a conflict of interest in *Austin*, 327 Md. at 381–82 n. 1, 609 A.2d at 731 n. 1, *infra*. We stated that:

> "In certain Sixth Amendment contexts, prejudice is presumed. Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice. So are various kinds of state interference with counsel's assistance. . . . One type of actual ineffectiveness claim warrants a similar, though more limited, presumption of prejudice. In *Cuyler v. Sullivan*, 446 U.S. at 345–50, 100 S.Ct. at 1716–19, 64 L.Ed.2d at 343–47, the [Supreme] Court held that prejudice is presumed when counsel is burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts, *see, e.g.*, Fed.Rule Crim.Proc. 44(c), it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest."

(*quoting Strickland*, 466 U.S. at 692, 104 S.Ct. at 2067, 80 L.Ed.2d at 696). We shall discuss *Austin* in more detail, below.

### *Conflicts within the Office of the Public Defender*

The case *sub judice* involves two attorneys from the same district office [10] of the Public Defender, representing two different defendants (not co-defendants). While this Court has never constructed a bright line rule as to conflicts of interest within public defenders' offices, it has examined con-

---

**10.** Md.Code (1957, 2003 Repl.Vol.), Art. 27A § 2(c), defines "District," in the context of district offices of the public defender. It states that " 'District' means an area comprising one or more political subdivisions conforming to the geographic boundaries of the District Court districts established in § 1–602 of the Courts Article of the Code."

flicts of interest within private law firms.[11] In *Austin*, 327 Md. at 381, 609 A.2d at 730, two attorneys from the same private law office were representing two co-defendants. As in the case *sub judice*, we examined "whether defense counsel labored under such a conflict of interest that the defendant's constitutional right to the assistance of counsel was violated." We explained that "[t]he cases which have considered the issue have generally concluded that representation of co[-]defendants by partners or associates in a private law firm should be treated the same, for purposes of conflict of interest analysis, as representation of co[-]defendants by one attorney." *Austin*, 327 Md. at 383, 609 A.2d at 732. We concluded that "the potential for a conflict of interest is present whenever co[-]defendants are represented by the same lawyer or by lawyers who are associated in practice." *Austin*, 327 Md. at 385, 609 A.2d at 733.

We declined, however, to examine in *Austin* whether public defender offices were considered private law firms for purposes of such conflicts of interest analyses. We explained that "[w]ith regard to public defender offices, there appears to be some disagreement among the cases as to whether, and to what extent, a public defender's office is to be viewed like a single private law firm for purposes of applying conflict of interest principles. . . . We have no occasion in the instant case to explore this matter." *Austin*, 327 Md. at 384–85 n. 3, 609 A.2d at 732–33 n. 3. This Court has, therefore, never before resolved whether general conflict of interest principles apply, as a *per se* rule, to the representation of individuals with adverse interests within the same public defender district office.

---

**11.** *See also* Maryland Rule of Professional Conduct 1.10, entitled "Imputation of Conflicts of Interest: General Rule," which explains, in pertinent part, that:

> (a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7 or 1.9, unless the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm.

The Court of Special Appeals did confront this issue, however, in *Graves v. State,* 94 Md.App. 649, 654–56, 619 A.2d 123, 126 (1993), *rev'd on other grounds,* 334 Md. 30, 637 A.2d 1197 (1994). Graves was charged with assault and attempted robbery with a dangerous and deadly weapon. A man named Trusty was a co-defendant in the case. Both men were represented by assistant public defenders from the same district office of the Office of the Public Defender. Graves filed a motion for a mistrial and motion to strike the appearance of the Office of the Public Defender, in his case, on the grounds that a conflict of interest existed. The trial court denied the motion for a mistrial and refused to strike the appearance of the Office of the Public Defender. Graves appealed to the Court of Special Appeals.

The intermediate appellate court did not adopt a *per se* rule that a public defender's office is the same as a private law firm, with regards to conflicts of interests. It stated, however, that "[a]lthough we do not adopt a *per se* rule, we regard the loyalty of each Maryland lawyer to a client to be of the 'utmost importance,' which is not to be 'diminished, fettered, or threatened in any manner by his loyalty to another client.' " *Graves,* 94 Md.App. at 667, 619 A.2d at 132 (*quoting Allen v. District Court,* 184 Colo. 202, 519 P.2d 351, 353 (1974) (en banc)). Furthermore, the *Graves* court determined that "[f]or the purposes of this opinion, district offices of the district public defender are analogous to independent private law firms." *Graves,* 94 Md.App. at 670, 619 A.2d at 133. The court continued:

> When [a] potential conflict is brought to the attention of the court, it must conduct a full evidentiary hearing to determine if "facts peculiar to the case preclude the representation of competing interests by separate members of the public defender's office." *Miller,* 38 Ill.Dec. 775, 404 N.E.2d at 203.

*Graves,* 94 Md.App. at 671, 619 A.2d at 134. The court determined that the record was incomplete as to Trusty's representation but that the record was clear that the trial court found that a conflict of interest arose between the

assistant public defenders, "but it failed to explore fully the nature and extent of any conflict." *Graves,* 94 Md.App. at 673, 619 A.2d at 135. The court explained:

> When the issue is raised by the court, the Public Defender, the State or a defendant, the trial court, in determining whether there is a conflict of interest, should
>
>> 1. determine whether attorneys employed by the same public defender's office can be considered the same as private attorneys associated in the same law firm;
>>
>> 2. weigh factors relating to the protection of confidential information by considering whether there are separate offices, facilities and personnel; and
>>
>> 3. determine whether, as a consequence of having access to confidential information, an assistant public defender refrained from effectively representing a defendant.
>
> [ ] We do not intend that the three considerations set out above should in any way limit the court in its determination of whether a conflict of interest exists. When the potential conflict is brought to the attention of the court, it must conduct a full evidentiary hearing to determine if "facts peculiar to the case preclude the representation of competing interests by separate members of the public defender's office." *State v. Miller,* 79 Ill.2d 454, 38 Ill.Dec. 775, 404 N.E.2d 199, 203 (1980).

The court remanded the case to the trial court to conduct an evidentiary hearing to determine whether, and to what extent, a conflict of interest existed that prejudiced Graves at trial. *Graves,* 94 Md.App. at 673, 619 A.2d at 135. The court explained that if the trial court discovered no conflict, then the judgments could stand. If it found a conflict that prejudiced Graves, then the court was to vacate the judgments and award Graves a new trial.

The intermediate appellate court in *Graves* also acknowledged, as this Court did in *Austin, supra,* that jurisdictions remain divided on the issue of how to treat public defender's offices during a conflict of interest analysis. Some jurisdictions have treated public defender's offices in the same man-

ner as private law firms during the course of a conflict of interest analysis. *See, e.g., Williams v. Warden,* 217 Conn. 419, 586 A.2d 582, 589 n. 5 (1991); *Rodriguez v. State,* 129 Ariz. 67, 628 P.2d 950, 953–54 (1981) (en banc); *State v. Smith,* 621 P.2d 697, 698–99 (Utah 1980); *Allen,* 519 P.2d at 353; *Ward v. State,* 753 So.2d 705, 708 (Fla.Dist.Ct.App.2000).

Other jurisdictions have instead expressed a need for the trial court to examine the potential for conflict. *See, e.g., Asch v. State,* 62 P.3d 945, 953 (Wyo.2003) (concluding that "a case-by-case inquiry, rather than per se disqualification, [is] appropriate for cases alleging a conflict of interest based on representation of co-defendants by separate attorneys from the State Public Defender's Office"); *State v. Bell,* 90 N.J. 163, 447 A.2d 525, 529 (N.J.1982) (requiring the court to determine the likelihood of prejudice resulting); *People v. Robinson,* 79 Ill.2d 147, 37 Ill.Dec. 267, 402 N.E.2d 157, 162 (1979) (requiring the trial court to conduct a case-by-case inquiry to determine whether, and to what extent, a conflict o f interest existed).

■ In addition, as Petitioner sets forth in his brief, the Restatement (Third) of the Law Governing Lawyers § 123 (2000), agrees with Petitioner's position in this case. It explains that any conflict of interest affecting one lawyer applies to any and all other lawyers who are "associated with that lawyer in rendering legal services to others through a law partnership, professional corporation, sole proprietorship, or similar association." It explains further that the "rules on imputed conflicts and screening of this Section apply to a public-defender organization as they do to a law firm in private practice in a similar situation." Restatement (Third) of the Law Governing Lawyers § 123 cmt. (d)(iv) (2000). We hold that, at a minimum, each district office of the public defender should be treated as a private law firm for conflict of interest purposes.

### The Instant Case

■ In the case *sub judice,* defense counsel notified the administrative judge, in advance of trial, that she was laboring

under a conflict of interest. The *Glasser/Holloway* line of reasoning, and not the *Cuyler* line of reasoning, is therefore applicable because only the former line of reasoning is applicable in cases where the trial court is notified of the conflict. As explained *supra,* under the former line of Supreme Court reasoning, and in accordance with *Graves,* a court that is confronted with the possibility of a conflict of interest must take adequate steps to determine whether such a conflict exists. Under *Mickens,* 535 U.S. 162, 122 S.Ct. 1237, 152 L.Ed.2d 291, when an actual conflict exists, the criminal defendant is entitled to a reversal. We conclude, therefore, that the administrative judge erred, as a matter of law, when she denied defense counsel's motion for a continuance because an actual conflict existed and she failed to take adequate steps to cure that conflict or permit defense counsel to cure the conflict.

In this case, defense counsel explained, both orally and in writing, that because of the nature of the conflict in the Montgomery County Office of the Public Defender, she would be unable to represent Petitioner effectively since another assistant public defender in that office was representing Muse in another case. She explained that, because of the nature of her office, and the theory of her case, she had conflicted duties of loyalty to Petitioner and Muse. As a result of the duties of loyalty, Petitioner's counsel was not able to interview Muse or speak to Muse's attorney about this case prior to the commencement of Petitioner's trial. Furthermore, if defense counsel gained access to information pertaining to Muse's role in the robbery at issue, she would not have been able to inform the police or elicit the information at trial; her obligations to Muse would have prevented her from doing so, and these obligations directly conflicted with her obligations to represent Petitioner zealously. We determine that the limitations espoused by defense counsel would be detrimental to Petitioner's case and, thus, a clear conflict of interest existed in the case *sub judice.* As we determined in *Lettley,* 358 Md. at 44, 746 A.2d at 402, "[t]he conflict of interest is inherent in the divided loyalties."

As we have previously stated, defense counsel's representations about specific conflicts of interest should be credited, and we therefore give credence to them here. *See Lettley,* 358 Md. at 48, 746 A.2d at 404. Lawyers are officers of the court and should be treated as such. *See Attorney Grievance Comm'n v. Link,* 380 Md. 405, 427, 844 A.2d 1197, 1211 (2004). If the administrative judge questioned defense counsel's credibility or motives in requesting the motion to continue, then she could have conducted an evidentiary hearing. If she did not have an issue, which is what the record suggests, then she should have granted the motion to continue under the circumstances.

■ As we stated *supra,* the Supreme Court held, in *Cuyler,* 446 U.S. at 345–50, 100 S.Ct. at 1716–19, 64 L.Ed.2d at 343–47, that prejudice is presumed when counsel becomes burdened by the existence of an actual conflict of interest because, in those situations, counsel must breach the duty of loyalty, "perhaps the most basic of counsel's duties." *Austin,* 327 Md. at 381 n. 1, 609 A.2d at 730 n. 1 (*quoting Strickland,* 466 U.S. at 692, 104 S.Ct. at 2067, 80 L.Ed.2d at 696). The Supreme Court also explained in *Strickland,* 466 U.S. at 692, 104 S.Ct. at 2067, 80 L.Ed.2d at 696, that

> it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts . . . it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest.

We adopt the interpretation of the courts that have interpreted the Supreme Court's holdings to mean that when the trial court is notified of a potential conflict and fails to take adequate steps to investigate the potential for conflict or requires conflicted representation, despite the conflict, reversal is automatic, without a showing of prejudice of adverse effect upon representation. *See Lettley,* 358 Md. at 38–39, 746 A.2d at 399 (summarizing Supreme Court jurisprudence and

the interpretation by other jurisdictions of this jurisprudence). Furthermore, drawing upon the Supreme Court's recent decision in *Mickens,* 535 U.S. 162, 122 S.Ct. 1237, 152 L.Ed.2d 291, because the conflict in this case was an actual conflict, Petitioner is entitled to a reversal. *See also Gatewood v. State,* 388 Md. 526, 538, 880 A.2d 322, 329 (2005) (stating that when a trial judge fails to evaluate whether a conflict of interest existed, the appropriate remedy is reversal).

Defense counsel clearly explained to the administrative judge that she was laboring under a conflict of interest. She explained that the case was one of mistaken identity and that Muse was an important witness with whom she could not speak because he was being represented by another attorney in the same office of the Public Defender. She requested a continuance, because of this conflict, for the purpose of finding a panel attorney who could resume representation of Petitioner. The administrative judge stated that *"[i]f* there [was] a conflict, then Mr. Gottlieb c[ould] move to continue M[use]'s case and remove himself from that case" (emphasis added). The judge, therefore, failed to fully examine or acknowledge that a conflict actually existed in Petitioner's case. Instead, she determined that because Petitioner's trial would commence before Muse's trial, Petitioner's counsel could represent Petitioner, and then Muse's attorney could ask for a continuance. In doing so, the court denied Petitioner effective representation, in this case, because defense counsel could not effectively question Muse or present evidence against Muse during Petitioner's trial. Under the circumstances, the only possible cure would have been a waiver of the conflict by the defendant or replacement of the defendant's attorney.

As the Supreme Court stated in *Mickens,* 535 U.S. at 173, 122 S.Ct. at 1244, 152 L.Ed.2d. at 306, "where the potential conflict is in fact an actual one, only inquiry will enable the judge to avoid all possibility of reversal by either seeking waiver or replacing a conflicting attorney." The administrative judge in this case, however, failed to explain adequately to Petitioner about the actual conflict of interest and failed to

determine whether he wanted to waive the conflict.[12] The judge asked Petitioner whether he wanted a continuance or whether he wanted to proceed without counsel. Petitioner explained that he would proceed without counsel if his attorney could not represent him.[13] Petitioner did not, at any point, agree to waive his right to conflict-free representation. At no time did the court explain to Petitioner that he had a right to waive the conflict of interest and have his attorney go forward and represent him. Because an actual conflict existed, the administrative judge had a duty to determine whether Petitioner waived the conflict before she allowed defense counsel to continue her representation of Petitioner. *See Austin*, 327 Md. at 393, 609 A.2d at 737 (stating that once the judge perceived the conflict, he should have asked the client whether he waived the conflict; in failing to do so, and allowing the conflicted representation to continue, the judge reached an improper compromise).

In denying the continuance, the administrative judge also failed to allow time for the District Public Defender to panel the case to another lawyer. As stated *supra*, the administrative judge could have granted the continuance without violating the *Hicks* rule. At the time that defense counsel filed the motion for a continuance, the trial date was within *Hicks*. Even if the case could not have been reset within *Hicks*, the administrative judge would have been able to find good cause for resetting the trial date outside of *Hicks*.

The State contends that no conflict existed because Muse and Petitioner were not codefendants. We reject this contention. While Muse and Petitioner were not co-defendants at trial, their interests were still in conflict because

---

**12.** *See* Maryland Rule of Professional Responsibility 1.7 explaining that a client can continue his or her representation by an attorney with a conflict of interest, so long as the client gives informed consent, in writing.

**13.** Petitioner was entitled to discharge his counsel, pursuant to Maryland Rule 4–215(e), so long as the court found a meritorious reason for the defendant's request.

Petitioner contended that he was innocent and that Muse was the perpetrator of the crimes for which Petitioner was charged and subsequently convicted. We have never held that conflicts exist only in cases involving codefendants; to the contrary, we have held that conflicts of interest exist even in cases where the individuals are not co-defendants. In *Lettley*, 358 Md. at 29, 746 A.2d at 394, appellant was convicted of attempted first degree murder, use of a handgun in the commission of a crime of violence, and reckless endangerment. He contended, on appeal, that his attorney "labored under an actual conflict of interest requiring reversal of his convictions," because the attorney represented both appellant and another client, who was not a co-defendant in the case but was someone who had confessed to the attorney that he had committed the crimes at issue. We held that a conflict of interest did exist and that "the defendant's right to conflict-free representation is not limited to situations involving multiple representation, but extends to any situation in which defense counsel owes conflicting duties to the defendant and some other third person." *Lettley*, 358 Md. at 34, 746 A.2d at 397. Here, Petitioner's counsel owed conflicting duties to Petitioner and Muse.

We also reject the State's contention that a conflict of interest did not exist because the State's witnesses all claimed that Muse was not present during the robbery in question. Petitioner's counsel requested a continuance prior to the commencement of Petitioner's trial; hence the evidence presented at Petitioner's trial is irrelevant to this analysis. For the same reason, we also reject the State's argument that because Petitioner elicited evidence concerning Muse during trial and attempted to shift the blame to Muse during closing arguments, Petitioner's defense was not impaired, and he is not entitled to reversal. The conflict was present prior to the start of the trial and still prevented Petitioner's counsel from investigating Muse's role in the pertinent offenses.

Decisions rendered in other jurisdictions support this holding. For example, in *Allen*, 519 P.2d at 352, the public defender's office represented a criminal defendant, Allen, who

offered crucial evidence against another individual that was represented by the public defender's office. Allen's attorney filed a motion to withdraw from the case on the grounds that a conflict of interest prevented both Allen and the other individual from obtaining effective assistance of counsel. The trial court denied the motion. The Supreme Court of Colorado stated that

> [t]he need for defense counsel to be completely free from a conflict of interest is of great importance and has a direct bearing on the quality of our criminal justice system.... A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in [sic] behalf of a client will be or is likely to be adversely affected by his representation of another client.... [The Code of Professional Responsibility] is intended to guarantee the independence of counsel from the conflicting interests of other clients in order to preserve the integrity of the attorney's adversary role.... It is of the utmost importance that an attorney's loyalty to his client not be diminished, fettered, or threatened in any manner by his loyalty to another client.

*Allen*, 519 P.2d at 352–53. The court determined that Allen's attorney could not have represented Allen effectively because of this conflict. It explained that although two different public defenders were representing the two different individuals, any knowledge or information gained by one public defender would be imputed to the other. Accordingly, the court determined that the trial court erred in denying Allen's attorney's motion to withdraw from the case. It stated that such "genuine conflicts of interest must be scrupulously avoided." *Allen*, 519 P.2d at 353. *See also, Commonwealth v. Green*, 379 Pa.Super. 602, 550 A.2d 1011, 1012–13 (1988) (concluding that the public defender's office of a county was, "by its very nature, a law firm," and that a conflict of interest existed because of representation by co-defendants by the same county office; the criminal defendant was therefore entitled to a new trial); *Turner v. State*, 340 So.2d 132, 133 (Fla.Dist.Ct.App.1976) (stating that a public defender's office in any given circuit should be treated the same as a private law firm for conflict of

interest purposes and that a public defender may not represent a criminal defendant if such representation will affect adversely the representation of another client).

### Post–Conviction Proceeding

 The State argues that this Court should decline to decide whether there existed an actual conflict of interest in this case and, instead, that this issue should be explored in a post-conviction proceeding. We disagree. We can address the matter appropriately on direct appeal. Accordingly, there exists no need to remand the case and address the issue in collateral proceedings.

In *Smith v. State,* 394 Md. 184, 199, 905 A.2d 315, 324 (2006), we explained that a claim for the ineffectiveness of counsel ordinarily should be addressed in a post-conviction proceeding. *See also In re Parris W.,* 363 Md. at 726, 770 A.2d at 207; *Ware v. State,* 360 Md. 650, 706, 759 A.2d 764, 793 (2000); *Perry v. State,* 344 Md. 204, 227, 686 A.2d 274, 285 (1996); *Walker v. State,* 338 Md. 253, 262, 658 A.2d 239, 243, *cert. denied,* 516 U.S. 898, 116 S.Ct. 254, 133 L.Ed.2d 179 (1995). We stated in *Smith* that:

> The main justification for the rule is that, generally, the trial record does not provide adequate detail upon which the reviewing court could base an assessment regarding whether counsel rendered ineffective assistance because the character of counsel's representation is not the focus of the proceedings and there is no discussion of counsel's strategy supporting the conduct in issue.

*Smith,* 394 Md. at 200, 905 A.2d at 324. We explained, however, "that the general rule, [ ] is not 'absolute and, where the critical facts are not in dispute and the record is sufficiently developed to permit a fair evaluation of the claim, there is no need for a collateral fact-finding proceeding, and review on direct appeal may be appropriate and desirable.'" *Id.* (quoting *In re Parris W.,* 363 Md. at 726, 770 A.2d at 207). We thereafter determined that a failure to address the ineffectiveness claim on appeal would be a waste of judicial resources and proceeded with our analysis of whether Smith's constitu-

tional right to effective assistance of counsel was violated. *Smith,* 394 Md. at 201, 905 A.2d at 325.

Our reasoning and decision in *Austin* is most instructive on this point, as *Austin* involved issues similar to those present in the case *sub judice.* In *Austin,* 327 Md. at 394, 609 A.2d at 737, we explained that:

> It is true that in cases involving claims of deficient performance by defense counsel, although not involving conflict of interest claims, we have taken the position that "[i]n the usual case, a post conviction proceeding is most appropriate." *Harris v. State,* 299 Md. 511, 517, 474 A.2d 890, 892– 893 (1984), and cases there cited. As previously noted, however . . . a claim that the constitutional right to counsel was violated because of defense counsel's conflict of interest has been treated by courts as different from a claim that the constitutional right to counsel was violated because of defense counsel's deficient performance apart from conflict of interest. Moreover, in *Pressley v. State, supra,* 220 Md. 558, 155 A.2d 494, and *Brown v. State, supra,* 10 Md.App. 215, 269 A.2d 96, the conflict of interest issue was decided on direct appeal based on the criminal trial record. In the instant case, it was the action of the trial court as the result of the conflict which caused an adverse effect on defense counsel's representation. There is no need to await a fact-finding post conviction hearing.

Similarly, in *Lettley,* 358 Md. at 32, 746 A.2d at 396, we stated that "[w]here the claim is based on conflict of interest, and the record is clear . . . there is no need to await a post-conviction hearing." Because the record was clear and the necessary facts were contained in the record, we stated that "[n]o useful purpose would be served by relegating the issue to post-conviction proceedings." *Id.*

In accordance with this reasoning, we hold that there is no need to await a fact-finding post conviction hearing, as the State suggests. As in *Austin* and *Lettley,* it was the trial court's action, as the result of a conflict of interest—the administrative judge's denial of defense counsel's motion for a

continuance—that caused the adverse effect on Petitioner's representation. Consequently, the trial court's judgment is reversed and Petitioner is entitled to a new trial.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AND TO REMAND THE CASE TO THE CIRCUIT COURT FOR A NEW TRIAL. MONTGOMERY COUNTY TO PAY THE COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS.**